In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 20-3254

CURTIS LOVELACE, *et al.*,

*Plaintiffs-Appellees,*

*v.*

ADAM GIBSON, *et al.*,

*Defendants-Appellants.*

_____

No. 20-3255

CURTIS LOVELACE, *et al.*,

*Plaintiffs-Appellees,*

*v.*

JAMES KELLER,

*Defendant-Appellant.*

_____

Appeals from the United States District Court for the
Central District of Illinois
No. 17-cv-1201 — **Sue E. Myerscough**, *Judge.*

_____

ARGUED NOVEMBER 30, 2021 — DECIDED DECEMBER 22, 2021

_____

Before KANNE, WOOD, and HAMILTON, *Circuit Judges*.

WOOD, *Circuit Judge*. Cory Lovelace died in her bed one morning in February 2006. Cory was not in good health, and nobody at the time suspected foul play. But seven years later, while browsing through old photographs, Detective Adam Gibson hatched a theory: that Cory's husband, Curt Lovelace, had suffocated her with a pillow. Gibson, along with Coroner James Keller and several other local officials, launched a relentless investigation, leading to Curt's arrest and prosecution for murder. In the end, Curt was acquitted by a jury, but only after he endured a mistrial, a series of evidentiary irregularities, and more than two years' detention. After Curt was vindicated at trial, he sued Gibson, Keller, and the other officials, alleging numerous violations of his constitutional rights. At summary judgment, the officials asserted qualified immunity from some of Curt's claims. The district court denied their motions.

The officials now seek to take an appeal, again in pursuit of qualified immunity from Curt's Fourth and Fourteenth Amendment theories. We lack appellate jurisdiction over the Fourth Amendment theory underpinning Curt's Count II, however, and so we dismiss that portion of the appeal. As for the Fourteenth Amendment theory underpinning Count I, Curt concedes that circuit precedent now forecloses it, and so we reverse on the basis of his withdrawal of that argument.

**I**

In reaching its decision, the district court properly construed all genuine disputes of material fact, along with reasonable inferences from those facts, in favor of Curt, the

nonmovant. See *Gutierrez v. Kermon*, 722 F.3d 1003, 1005 (7th Cir. 2013). We do the same.

## A

Because Cory was relatively young when she died, the City of Quincy police, along with several Adams County officials, conducted a thorough investigation of her demise. All the physical evidence pointed toward a natural cause of death. It turned out that Cory was severely alcoholic, bulimic, and had been sick with flu-like symptoms for several days before she died. An autopsy revealed that Cory had been suffering from "marked steatosis of the liver." Severe steatosis—significant fat throughout the liver—can cause the liver to become inflamed and riddled with scar tissue; at that point the person has cirrhosis of the liver, which can lead to liver failure and death. See, *e.g.,* Cleveland Clinic, Fatty Liver Disease, https://my.clevelandclinic.org/health/diseases/15831-fatty-liver-disease (last visited Dec. 15, 2021). This evidence could not establish a single, indisputable cause of death, but it was more than enough to suggest an array of plausible natural explanations—chronic alcoholism, when combined with other medical conditions, can itself be fatal. Moreover, Cory's body bore no signs of violent trauma. She had a small patch of redness under her nose, but it was more consistent with a cold or acne than with violence. And she had a small cut inside her mouth, but because it was already healing when Cory died, it was determined to have predated her death.

Investigators also verified Curt's account of the morning in question by comparing his story to the physical evidence indicating time of death. Curt recounted that Cory was supposed to take their three school-aged children to school that

day, as Curt was scheduled to teach a class at a local university. But Cory was still unwell when she woke up. They decided that Curt would cancel his class and take their children to school instead. At one point Cory came downstairs to help get the children ready, but she was feeling very weak, and so Curt helped her back upstairs and into bed. Curt then took the children to school at around 8:15 am. He was back at the house by 8:35 am, but he did not go upstairs until around 9 am, when he discovered that Cory had died. The police interviewed Curt's three oldest children; all three corroborated this timeline. In particular, all three confirmed that they had seen their mother alive and moving about on the morning in question.

Dr. Jessica Bowman, who performed the autopsy, had some preliminary concerns about whether that timeline could be squared with the degree of rigor mortis the body evinced later that morning. But the first responders—including a paramedic, two detectives, and Gary Hamilton, who was then the Coroner of Adams County—all reported that when they had examined the body at around 10 am, it was still warm, fairly pliable, and showed only mild, unset lividity (lividity is the discoloration of the skin that results from the settling of blood following death). Indeed, EMT Ballard was able without trouble to move Cory's arms from a position on her body to a point above her heart, so that he could attach a probe there in an attempt to revive her. As the arms continued to stiffen, they remained in the position in which Ballard had left them. Based on all the evidence, Dr. Bowman indicated that the cause of death was inconclusive. At no point did she suggest foul play. The police, too, deemed the death a tragedy but not a crime, and so closed the file.

B

There the story should have ended. But seven years later, Detective Gibson set in motion a second act. Formerly one of the Quincy police department's canine officers, Gibson had been reassigned to elder services after his dog retired. But the new role did not keep him busy, it seems, and so to pass the time he made a habit of reviewing files from old cases. One photo of Cory's body in the Lovelace file caught Gibson's attention in November 2013. In it, her arms were raised in what appeared to Gibson to be an unnatural position. He concluded that Curt had suffocated Cory with a pillow the evening before her death was reported, that rigor had set in overnight, and that her arms had stayed put when the pillow was removed sometime the next morning. This was, as we already have noted, wild speculation; Gibson was simply looking at photos that were taken after Ballard repositioned Cory's arms.

But Gibson was convinced that he was on to something. With approval from his supervisors, he launched a full-blown murder investigation. It was not long before Coroner Keller joined Gibson's effort, in December 2013, and provided a critical evidentiary boost. Keller had been at the scene for a few minutes to help move the body (he ran a local funeral home at the time), and so he passed for an eyewitness. He claimed, apparently without notes or other corroboration, to recall that Cory's body had been in *full*, not partial, rigor, and that the room had smelled bad, as if her body had already begun to decompose. Those claims, if true, would have supported Gibson's alternate timeline and contradicted Curt's account. But no other eyewitness, including several who had spent far more time on the scene than Keller, had

reported a similar degree of rigor or mentioned any strong odor. Moreover, Keller made no effort to explain how someone could have moved Cory's arms if Keller was correct.

Gibson and Keller next began to shop around for a forensic expert who would bolster the case against Curt. They started in early January 2014 with Dr. Derrick Pounder. But after hearing Gibson's theory, Dr. Pounder explained in an email that "rigor is not a reliable method of estimating time of death." And he advised Gibson that Cory could have spoken to her children that morning, just as Curt claimed, and then been dead with her arms at some stage of rigor 90 minutes later. Gibson did not write up a report memorializing Dr. Pounder's conclusions.

In late January, Gibson and Keller consulted Dr. Scott Denton. Like the original investigators, Dr. Denton quickly dismissed the redness above the lip and small cut in the mouth as irrelevant. And he, too, homed in on the liver as the most likely cause of death. In February, Gibson met with Dr. Denton in person, but again he made no record of Dr. Denton's opinions. Nor did Dr. Denton himself submit any report at the time. (He did file one eventually, but it came almost 300 days after Curt was arrested and so had nothing to do with probable cause for the arrest.)

Gibson and Keller then returned their attention to Dr. Bowman, who had performed the original 2006 autopsy. But she refused to change the official cause of death from "undetermined" to suffocation, even in the face of Gibson's intensive lobbying in the form of numerous phone calls and several multi-hour meetings. Gibson, yet again, made no report memorializing Dr. Bowman's skepticism. But he did later assert, apparently without any factual basis, that Bowman

"felt during the initial autopsy that suffocation was the cause of death."

For a fourth opinion, in March, Gibson turned to Dr. Shaku Teas. But she, too, concluded that the condition of the liver and other evidence of chronic alcoholism made a natural death most likely. And Dr. Teas saw no reason to believe Gibson's murder-by-suffocation hypothesis. Gibson instructed Dr. Teas not to prepare a report, but she was troubled by his approach to the case and did so anyway. She later testified as a witness for Curt's defense.

Gibson and Keller's fifth and final attempt to secure a favorable expert opinion took place in April and May, when they presented the case to Dr. Jane Turner. That time, they took a more aggressive approach. Rather than providing Dr. Turner with an accurate and complete picture of the evidence and allowing her to draw her own conclusions, they provided her with selected background "facts." They told Dr. Turner that Cory was in full rigor before the paramedics arrived (not mentioning that this was at least disputed), told her about the minor injuries to Cory's lip and mouth but omitted any mention of the benign explanations for those injuries, and falsely suggested that another expert—Dr. Denton—had already all but confirmed the suffocation theory. Most damningly, they told Dr. Turner about the position of Cory's arms, but not that the arms had been repositioned by the paramedics. Dr. Turner, making it clear that her conclusions rested solely on the information that had been presented to her, prepared a report supporting the suffocation hypothesis.

In August 2014, Curt was arrested. Unable to make bail, he spent the next 21 months in jail, followed by another nine

months under house arrest. His first trial ended in a mistrial because of a hung jury. After that first trial, Freedom of Information Act requests brought to light a wide array of important but undisclosed evidence. Among other things, the FOIA requests turned up the troubling communications we have just described that Gibson and Keller had with the five experts. None of those communications had been provided to Curt's defense team before the first trial. Armed with that new evidence, the defense team apparently made short work of the prosecution's case at a second trial, in March 2017. The jury acquitted Curt after just two hours of deliberation.

C

After his acquittal, Curt and three of his children sued Gibson, Keller, Gibson's supervisors (Quincy Chief of Police Robert Copley, Sergeant John Summers, and Lieutenant Dina Dreyer), and several other defendants who are not part of this appeal. As relevant here, Curt alleged that Gibson, Gibson's supervisors, and Keller had violated his Fourteenth and Fourth Amendment rights. The Fourteenth Amendment count (Count I) was premised on alleged fabrication and manipulation of evidence in violation of Curt's due-process rights, and on violations of his right under *Brady v. Maryland*, 373 U.S. 83 (1963), to be provided with exculpatory evidence. The Fourth Amendment count (Count II), sometimes called the "malicious prosecution" count, was premised on Curt's nearly three years of detention, which he contended had been without probable cause. See *Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018) (recognizing a longstanding constitutional right, under the Fourth Amendment, "not to be held in custody without probable cause").

At summary judgment, Gibson, his fellow City of Quincy defendants, and Keller all asserted qualified immunity. As we now explain, there is considerable confusion about the specifics of the claimed immunities. It is enough for the moment to say that the district court rejected whatever immunities the various defendants asserted.

One final note before we turn to our analysis: Gibson's supervisors have not, for present purposes, made any arguments other than those made by Gibson himself. Accordingly, their immunity rises or falls with Gibson's for now, and our references to Gibson in what follows apply equally to the other Quincy defendants.

## II

We begin our analysis with Curt's Fourth Amendment theory. Both Gibson and Keller seek to invoke "collateral order" jurisdiction to review their qualified immunity from that count. A collateral order qualifies as an immediately appealable final decision under 28 U.S.C. § 1291 only in a "small class" of rulings; that class "includes … decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying action." *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009) (citations and quotation marks omitted). Denial of an official's summary-judgment motion asserting qualified immunity is such an order "to the extent that [the denial] turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). But when the denial of qualified immunity turns, instead, on "a finding that genuine issues of material fact remain to be resolved, and thus summary judgment is unavailable," the col-

lateral-order doctrine does not permit interlocutory appeal. *Johnson v. Jones*, 515 U.S. 304, 317 (1995).

## A

This case implicates a corollary of the collateral-order doctrine so self-evident that we have not often had occasion to state it: something is not a collateral order if it is not an order at all. Put another way, an appellant attempting to appeal from a qualifying collateral order must first point to a passage in the district court's opinion addressing the contested issue. As this case comes to us, we have grave doubts about whether Gibson and Keller have cleared even that low bar.

At oral argument, we asked both Gibson's counsel and Keller's to indicate where in their summary-judgment briefing they had asserted qualified immunity from Curt's Fourth Amendment theory. They could not tell us. We also asked where, in the district court's comprehensive 106-page opinion, we could find a passage addressing qualified immunity on that branch of the case. Again, counsel could not tell us.

The supplemental briefing we then ordered to address those two questions has done little to alleviate our doubts. Gibson's brief does not even attempt to tackle our first question—where, specifically, did he assert qualified immunity from the Fourth Amendment count in his summary-judgment papers? We can only assume this means he did not do so (and our own review of his filings supports this assumption). As for the second question, Gibson directs us to a passage in the district court's opinion where the court denied the officers' assertion of qualified immunity on the basis

of "the questions of fact on Mr. Lovelace's constitutional claims." The problem, as we pointed out at oral argument, is that the passage to which Gibson refers is discussing qualified immunity from the Fourteenth Amendment *Brady* count. The Fourth Amendment theory is not mentioned anywhere in the surrounding pages. Gibson's supplemental brief neither acknowledges nor addresses this problem. Instead, it devotes three pages to a different issue that we did not authorize the parties to address in these supplemental filings.

Keller does not do much better. He first suggests that if he did not assert qualified immunity from the Fourth Amendment count, that was because Curt pleaded a "malicious prosecution" claim against him rather than an "unlawful detention claim." Putting to one side the fact that these are not independent *claims,* but instead are alternative theories of relief that are based on one set of underlying facts, a quick glance at the complaint puts paid to that rejoinder. Count II alleged that Keller had "caused Plaintiff Curtis Lovelace to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause." Compl. ¶ 87. And it alleged that such conduct was "in violation of [Curt's] rights secured by the Fourth Amendment." *Id.* ¶ 86. That was more than sufficient to give Keller the requisite fair notice of both the theory of relief and the legal and factual grounds upon which it rested. *Cf. Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (explaining our pleading standards). Moreover, federal-court plaintiffs are not required to plead legal theories in their complaints. A "short and plain statement of the claim showing that the pleader is entitled to relief" is enough. See Fed. R. Civ. P. 8(a)(2); *Johnson v. City of Shelby, Miss.*, 574 U.S. 10,

11 (2014). It thus would not matter even if Curt had cited the wrong part of the Constitution in the complaint.

Keller's supplemental brief at least identifies an explicit assertion of qualified immunity from the *Brady* theory. But that alone is not enough; qualified immunity operates on a theory-by-theory basis, not a person-by-person basis. Keller also directs us to his argument that summary judgment should be granted on the merits of the Fourth Amendment count because there was probable cause to arrest and hold Curt. But that is not enough either; a merits argument is not an immunity argument. And an officer asserting an immunity needs to tell the court that is what he is doing; he may not expect the court to infer this from other arguments. The closest Keller comes to such an assertion is a heading from his summary-judgment brief that reads, "any acts James Keller took as a county coroner are protected by qualified immunity." R. 90 at 27. But if that's it, then we cannot fault the district court for failing to reach the issue. See *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (explaining that "even arguments that have been raised may still be waived on appeal if they are underdeveloped, conclusory, or unsupported by law.").

In sum, we are left with grave doubts about whether Gibson and Keller can meet the most basic requirement for collateral-order jurisdiction over the Fourth Amendment theory—an actual collateral order.

B

But even giving Gibson and Keller the benefit of the doubt, we lack jurisdiction over the Fourth Amendment aspect of this case for a second, even more compelling, reason.

As we said above, our limited collateral-order jurisdiction does not extend to the resolution of disputes of material fact. We recognize only one qualification to that principle, "when the officer seeking immunity is willing to take the factual issues off the table and accept (for purposes of the qualified immunity motion) the factual account plaintiff has presented." *Estate of Davis*, 987 F.3d at 639. But if we detect a "backdoor effort to contest the facts," we will dismiss the appeal for lack of jurisdiction. *Id.* (quoting *Jones v. Clark*, 630 F.3d 677, 680 (7th Cir. 2011)). Put another way, "an appellant challenging a district court's denial of qualified immunity effectively pleads himself out of court by interposing disputed factual issues in his argument." *Gutierrez*, 722 F.3d at 1010.

The unresolved factual disputes bearing on Curt's Fourth Amendment theory are legion. Take, for example, Dr. Turner's report. Hers was the only expert report supporting the suffocation theory that Gibson and Keller had when they effectuated Curt's arrest. The district court, in addressing the merits of the probable-cause defense, noted a dispute about whether Gibson and Keller made "materially false statements" to Dr. Turner and the other pathologists. Yet on appeal, Gibson and Keller have continued to assert that Dr. Turner's opinion supported a belief that there was probable cause. (Indeed, Gibson pushes that point again in his supplemental brief on jurisdiction.) This reliance on Dr. Turner's findings inevitably implicates the dispute about whether her opinions were a product of manipulation. But that is a dispute we lack jurisdiction to resolve. Other such examples abound. How advanced was Cory's rigor mortis? How did the bedroom smell? Were Keller's memories of the scene as he claimed, or were they fabrications? On each point, Gibson

and Keller reject Curt's account. In light of these disputes, no plausible argument can be made that they have "fully accepted" Curt's "version of the facts." *Estate of Davis*, 987 F.3d at 640.

Because of those disputes, the district court denied Gibson's and Keller's motions for summary judgment on the merits of Curt's Fourth Amendment theory. Thus, even if we were to accept their invitation to read that portion of the opinion as also, though silently, denying qualified immunity, we still would lack jurisdiction. Whether there was probable cause on this record to support Curt's arrest and pretrial detention depends on how one weighs competing evidence and on whom one finds credible. But those are questions for a jury, not for us. Accordingly, we lack jurisdiction to address the officers' qualified immunity from Count II.

**III**

Our analysis of the Fourteenth Amendment theory is different. No jurisdictional problem stands in the way of our consideration of this ground for appeal. Gibson and Keller asserted qualified immunity from Curt's *Brady* and evidence-fabrication theories explicitly, and the district court rejected those assertions just as explicitly. We thus have a true collateral order in hand. On appeal, Curt has conceded that his Fourteenth Amendment claim is "not cognizable" under the current state of the law in this Circuit, see *Lewis v. City of Chicago*, 914 F.3d 472, 478 (7th Cir. 2019) and *Kuri v. City of Chicago*, 990 F.3d 573, 575 (7th Cir. 2021), but he has preserved for further review the question whether a *Brady* claim can be asserted by someone whose case ended in a mistrial, or someone was detained for a lengthy period in part because the prosecution failed to turn over exculpatory

evidence. This concession does not implicate any dispute of material fact, and so we may entertain it now. Nothing more need be said: based on the concession, on remand the officers are entitled to qualified immunity from Count I.

Only the legal theory, however, is out of the case. We do not understand Curt to be conceding any issue of fact that underlies his Fourteenth Amendment argument. If and when this case goes to trial on Count II and the other remaining claims, Curt may continue to allege that Gibson and Keller fabricated, manipulated, and withheld evidence, subject only to the ordinary relevance standards imposed by the Federal Rules of Evidence, as applied to his Fourth Amendment theory. And he may continue to argue that such conduct resulted in his detention without probable cause.

## IV

We DISMISS those aspects of the appeal related to the Fourth Amendment (Count II). We REVERSE the district court's denial of qualified immunity from the Fourteenth Amendment theory (Count I) to Gibson, Keller, Copley, Summers, and Dreyer, and we REMAND for entry of summary judgment in their favor on that theory of the case. Each side will bear its own costs on appeal.